U.S. Embassy in the Philippines  The next argued case is 14-17-25, Siemens Energy, Inc. v. United States. This is Sean. May it please the Court. My name is Mike Smarr, Counsel for Siemens Energy, Inc. There are three broad points that I'd like to make in the argument today, Your Honors. The first is that Commissioner Pinkert's threat determination relies on a false fact, a downward pricing trend for subject imports in 2012 that is unsupported by the data tables upon which he relied. The Court of International Trade deferred to that finding without looking at the evidence that Commissioner Pinkert claimed in support. Now on appeal, the government's defense is that Commissioner Pinkert did not mean what he said. His stated findings, however, are unambiguous. There can be no deference for a factual finding that is unsupported by substantial evidence. The second point, Your Honors, is that the injury and price suppression findings of Commissioners Williamson and Aronoff likewise are unsupported by substantial evidence, as reinforced by the fact that those findings were rejected by the other four commissioners. Even Commissioner Pinkert, one of the four, found no price suppression saying, quote, there is no indication that the subject imports placed a ceiling on domestic prices, whether by means of a price cap or otherwise. That's at JA-110. Third, the government asked the court to defer to the injury findings of Commissioners Williamson and Aronoff based on the tie vote provision at 19 U.S.C. 1677-11. But there is no tie vote on injury, nor is there a tie vote on threat. The government has avoided the fact that Commissioner Pinkert joined Commissioners Pearson, Johansson, and Broadbent, rejecting injury by a vote of four to two. In judicial review of agency determinations, the court defers to the expert fact finder. And this court has said that the expert fact finder is the majority of presidentially appointed Senate-approved commissioners. Okay, let's start with your last point. You've got a very good roll going there, since you had three points, all of which had a bunch of subpoints. But I'll try to at least outline your argument first. But let's go to your discussion of the tie vote provisions and what your focus is. You spend an awful lot of time talking about the general versus specific rules and the statutory provisions that govern divided votes under those circumstances. Is that really relevant to the tie vote provision that's before us now? Well, Your Honor, the tie vote provision tells you when you have enough affirmative votes in order for an order to issue. It does not tell you, and it tells you that if you have at least three affirmative votes, assuming that you have votes from all six commissioners, that that is an affirmative determination. So we have an affirmative determination here. You don't dispute that, right? No, we do not. All right. So then the substantial evidence review simply relates to the determination, right? Well, under 1516A, the role of the court is to look not only at the determination but also the findings and the conclusions of the commission. So the court has to look at the factual findings underlying the determination. So we have to find out if there's substantial evidence to support the determination? If there's substantial evidence for the factual findings in support of the determination. Right. Now, you may have an affirmative determination that may not be supported by substantial evidence. Well, clearly, we reverse determinations all the time. Yes. So my point in saying that, Your Honor, is that the tie vote provision doesn't tell you how to give deference to factual findings of the commission. The role of the court is to defer to the factual findings of the commission where they're supported by substantial evidence and where they're reasonable. So the question is... But the question is, really, so I'll tell you what the question is. The question is, we have to find substantial evidence and determine whether there is substantial evidence that supports the determination, right? Yes, Your Honor. All right. So we have a determination here. Now, I grant you that we're supposed to look at all the evidence and all the findings from both sides. So you look at the evidence that supports it and you look at the evidence that doesn't support it. But in terms of the findings, what we're supposed to find is whether there's substantial evidence that supports the ultimate determination, right? Not whether there's substantial evidence that might support a contrary determination. Well, the reason in 1516A, the court has to look at the findings and conclusions of the commission in support of the determination. So what are the findings of the commission? What did the commission find with respect to injury? What did the commission find with respect to price suppression on injury? Four of the commissioners found that there was no injury because they could find no adverse price effects from subject imports. Now, if the court were to say, well, we're going to take the findings of the two commissioners over the findings of the majority of the commission, that's substituting the judgment of the court for the findings of the commission. Go ahead. So there's never really an affirmative determination in a typo? Well, it depends on the factual findings, Your Honor, because the vote does not necessarily equate with the factual findings. And that's really the problem, I think, presented by this case is that the factual findings don't align with the votes that give you an affirmative determination. Well, isn't really the analysis that we have to find that there is substantial evidence to support the, I don't know whether you'd call it the majority determination because it's hard, but essentially it becomes the majority by operation of statute. But whether there's factual findings to support the determination of the two commissioners and then factual findings to support and substantial evidence to support the findings of Commissioner Pinkert, and then ultimately, if there are, isn't that enough? Well, if there's not substantial evidence, then the findings of Commissioner Pinkert or the findings of Commissioner Williamson and Aronoff are not sustained on that basis. But if there's substantial evidence in support of, let's say, a finding of price suppression, which Commissioners Williamson and Aronoff found, and there's also substantial evidence to support the findings of the four commissioners on the commission to say that there was not price suppression, then the court is presented with substantial evidence on both sides. What does the court, and let's assume that there is substantial evidence and both of the conclusions could be reasonable. So what does the court do in choosing between the two of them? The role of the court is to defer to the findings of the expert fact finder. And as I understand the language from Nippon Steele, and I'll grant the court its dicta, but to me that dicta is very clear, that the expert fact finder is the majority of the commission. And it would be logical too, Your Honors, because when the role of the commission is to find the facts in the case, the commission has a certain expertise and it's on the front line of determining what those facts are. So if four of the commissioners find certain evidence persuasive and two don't, that would be defining the commission. So do you disagree then with the underlying premise that once there's an affirmative determination, our role is simply to find if it's supported by substantial evidence? I do to this extent, Your Honor. The 1516A requires you to look at the factual findings and the conclusions. And the fact of the matter is that you have two different analyses when you're looking at injury versus threat. Under the statute, you have specific factors that you have to go through for threat. And for injury, you have the three primary factors, the volume of imports and the price effects, the impact. So because those are different inquiries and they involve different facts, they have to be treated separately. They have to be looked at separately on judicial review, even though you have an affirmative determination that would give you an order, assuming that it's not overturned. Right. Doesn't that increase the burden on the government to sustain the finding? Because they have to sustain it under all of those elements and factors. Well, Your Honor, four of the commissioners looked at both tests. They looked at whether there was injury and they looked at whether there was threat. Now, two of the commissioners did not, Williamson and Aronoff. They just found injury and they didn't say anything about threat. But I don't see anything in the statute that precludes them from making threat findings. Well, is it necessary for them to make a threat finding if they find a material injury finding? Shouldn't we assume they likely would have found a threat finding? Well, it depends on the vote. I don't think we should assume that because if they don't make that finding, let's suppose that the court finds there's not substantial evidence for injury. So if they make an implicit threat finding, then they have implicitly, I suppose, applied the factors under the statute for threat. And there's no way for the court to review an implicit threat finding and the analysis under the implicit factors that they applied to get to that conclusion. It would prevent the court from reviewing that conclusion if you allow them to make an implicit threat finding. Okay. Let's hear from the other side. We'll save you a rebuttal time. Are you Mr. Haldensad? Correct. Please. May it please the court. Michael Haldenstein from the International Trade Commission. Siemens would have the court believe there was something unusual about this case because the commission's determination was based on a mixed vote. Two commissioners found material injury and one found injury to be imminent, but mixed votes are a common occurrence at the commission. That's why there's a tied vote provision to take account of a split commission vote. Yeah, but this is a pretty unusual one. Three to three maybe is not unusual. But one where four commissioners make specific findings that are inconsistent with the ultimate judgment seems a little unusual, isn't it? Well, it's not unusual to have a dissent. And as Judge Barnett pointed out, this exact same voting pattern occurred in Meadowhark. And the court there rejected the notion that it should defer to the dissenting commissioners simply because they had more votes on certain findings. So it has been considered before. And there's often a dissent. And this court has made clear that it doesn't matter whether the findings are a threat or present injury, it is an affirmative determination of the commission. Siemens would like this court to change the standard of review for mixed vote cases. But it's long settled that the merits of the dissent are not the focus of substantial evidence review. Wouldn't it be better, though, if we had at least three commissioners making one determinative finding? I don't think it would be better. The statute provides for the situation. So I think it's intended to provide for an affirmative determination. And as you were alluding to, finding a material injury is a finding of threat. And that's what Judge Gordon indicated in the Wintowers case below. Well, should we remand and ask Commissioners Williamson and Aronoff to make a determination with respect to threat? No, they found material injury, and that's what's required under the statute. So that would be contrary to the law to remand for further findings. We have three affirmative determinations by the commissioners. All right, so assuming that we agree with you and it's the findings of those three that we're supposed to focus on, there are some, at least, fair weaknesses that have been pointed out with respect to those findings. The first is Commissioner Pinker's price finding. Now, I understand that you say he misspoke at some point and that you have to look at the totality of what he said. But do you agree with your friend on the other side that that's essentially your position? He didn't mean what he said the second time around? No, I don't agree with that. The only finding he made was that there was a convergence in the delivered cost bid prices. That's on JA-116, page 7 of his opinion. It's the downward trend in the gap between the bid prices. It's also important to remember that. Which suggests increased competition. Suggesting increased competition. And he, along with Commissioners Williamson and Aronoff, found no price depressions. Commissioner Pinker was not assessing price trends, only the difference in the bid prices. Okay, so when he referenced a downward pricing trend in the second paragraph on that page that you're referencing, he was referring back to the differential? That's correct. And that also can be viewed as a trend in the incremental cost of the subject imports. If you take a look at that table that he cited, and it's table 5-2, that's at JA-176, it shows a comparison to incremental costs, the incremental cost of the subject imports. And that is, what he's indicating is the difference went from, I believe it's 28% to 11%. There are percentages here on the right side. Incremental cost per imported talent, that was going down. So that's the trend. It's the trend in the gap was getting smaller as competition increased. But you have to concede that he misspoke then, that you believe he misspoke in the second paragraph when he referred to a downward pricing trend. Well, it was downward in the sense that the incremental cost per imported talent was going down. Okay, but he didn't say that the second time around. But this is the exact same finding that the other commissioners made, and they did say that that's the way they phrased it, that the incremental cost was going down. So it was a downward trend in the subject imports, and that's why he phrased it like that. If you look at the footnote 200 of the majority, that's JA101. It refers to the incremental cost, the trend in the incremental cost. So although the language could have been more precise perhaps, because it wasn't an assessment of the prices of the subject imports, it is – I mean, he was referring to the only trend that he identified. Okay, let me ask you about the conclusion that the commissioners Williams and Aronoff reached where they cited one e-mail, or at least that's what your opponent says. They cite one e-mail and one e-mail only to demonstrate that original equipment manufacturers were putting pressure on the domestic producers to renegotiate. And I've read that e-mail backwards and forwards, and other than somebody saying, you know, explain these prices to me. I don't see how that – is that the only basis that they had for that conclusion, or do you think there's something more? No, as Judge Burnett found, there was a lot of evidence of price competition. It wasn't just an e-mail. That's what opponents have alleged. But the commission noted the instances of the original equipment manufacturers pressuring domestic producers to rein in their prices. That's in footnote 194, JA100. The records show that domestic producers were given pricing targets. That's at a hearing at page 37, JA613. And the domestic producers were told that import prices were lower. That's at JA607. It's also true that the five of nine purchasers said that price was very important in buying decisions. That's at JA97. So there was more than just that e-mail that indicated that price was important in purchasing decisions. That e-mail – I guess I would characterize it as a red herring. It's just one communication indicating that purchasers did care about price. These wind towers cost hundreds of thousands of dollars. So it just wasn't true that prices didn't matter. And that's what – although that's what Siemens was arguing, that price was really essentially irrelevant, that only delivery – that only the cost of delivery was what mattered. So that's why the Commission cited that e-mail. But it wasn't just that e-mail. Okay, let's hear from you, Holly. Okay, Mr. Pickard. Good morning, Your Honors. I think Mr. Hollenstein did an excellent job of kind of representing our views, and I think these issues are well briefed. I think there are two specific – two general issues I'd like to address. The arguments in regard to majority-minority indifference to those opinions, as well as whether Commissioner Pickard made factually incorrect findings. But I think what I'd like to do, with the Court's permission, is specifically address Judge O'Malley's two of your most recent questions. First off, in regard to whether it's our position that Commissioner Pickard misspoke when he was talking, absolutely not. It has been our position that Commissioner Pickard was discussing a gap in prices. And what's the strongest evidence that he was discussing a gap in prices? It's the fact that he uses the term gap of prices. And then, when he goes on to talk about the trends, he literally uses the words, the trends in converging prices. And then he goes on to talk about this trend in downward pricing, following up on those previous statements. And that's what the record showed. The record showed that there was, in fact, a convergence in prices, which was cited because it was indicative of increased import competition. On a more macro level, this Court obviously reviews for purposes of substantial evidence. And as the Court has also acknowledged, really this review has to do with whether the determination is unreasonable. And here, Commissioner Pickard's statement in regard to price trends is one sentence in a very thorough analysis, and it's probably about his 11th or 12th point in, where he's basing his finding on threat of material injury in regard to the evidence of the volume of imports, the increase in capacity of the farm producers, their past history of serving into the market. And on that basis, I would suggest that it's a very reasonable approach. And to regard your specific question regarding the email, again, that certainly was not the only evidence that was relied upon by the Commission, and it wasn't the only evidence that was put forward by our clients. That email was submitted in conjunction with sworn testimony of our witnesses in regard to the price pressures from OEMs. And it was, of course, the role of the Commissioners to evaluate the credibility of the witnesses who appeared before it. The domestic industry showed up and testified under oath that they were faced with downward pricing pressure from the OEMs, and that subject import prices, even though they weren't always privy to the exact prices, were used as leverage to force their prices down. And this is supported by the actual factual findings in regard to the profitability of the domestic industry. All the parties conceded that the end of the period of investigation was a period of very high demand for wind power. But what happened to the domestic industry is their profitability plummeted. And if you look at it specifically in regard to cost of goods sold relative to net sales values, the percentage basically of costs as to sales, it increases throughout the period of investigation. Would including Vestas in that analysis skew those results? We think it's more appropriate to exclude Vestas from certain domestic industry data. And we've always taken the position, the answer to your question is no. Either way, I think you can get a reliable indication of the domestic industry's health. However, there were certain issues that were problematic with Vestas, not least of which is that, and this is all public information, that a large percentage of its production were internally consumed. So we have suggested, and consistent with what's called the captive consumption provision, that it's most probative to look at what was going on in the merchant market as compared to the total market. But at the end of the day, the results are the same. There's a huge increase in the volume of imports over the POI. They take significant market share directly from the domestic industry. The COGS, the ratio of net sales, increased dramatically over the period of investigation, which is supportive of the finding of price suppression. And the health of the domestic industry plumped. By the end of the period of investigation, it's lost market share, it's operating at a loss, and facilities are sitting idle. The Commission thoroughly discusses that both in... Its total sales have gone up, but it's, yes, correct. What's happened to its profitability? Right, at the cost of its profitability. Not only did it lose market share, but it lost market share subject to imports. And as a result, the profitability of the domestic industry goes from the black to the red. Right, so to the extent anything's sitting idle, it's not because they've got an ability to satisfy a demand and aren't getting the deals. If I understand your question correctly, there absolutely were facilities that sat completely idle during the period of investigation because they lost out opportunities to sell to the OEMs. Right, so there were a variety of evidence that was submitted in regard to the low capacity utilization of the domestic industry. And one just public example is the fact that Broadwind, which was a domestic producer of subject merchandise and a petitioner, spent millions of dollars to open up a brand new facility in Brandon, South Dakota, which never produced one wind tower. This was a period of huge increasing demand, and that demand was captured by the subject imports at the cost of the domestic industry. Under the standards that are applied by the Commission, that is more than material injury, defined to be injury that's more than immaterial, inconsequential, or insignificant, by reason of imports. There was a direct tie-off. And to the best of my knowledge, nobody's argued against this, but the lost sales from the domestic industry were captured by wind towers from China and Vietnam. There were specific findings that at least four of the Commissioners made that that's because the domestic industry wasn't able to satisfy a lot of the demand in certain geographic regions. I would say that there were at least three Commissioners in the dissent who found this, and I guess I know my light's on. Perhaps I could just wrap up very, very quickly. In regard to the substantial evidence review, 1677-11 clearly indicates tie votes become affirmative determination. 19 U.S.C. 1516a says it's the responsibility of the reviewing courts to examine the determination of the Commission. And thus, the Commission made an affirmative determination. Thank you very much. Thank you. Your Honors, if I had more time on rebuttal, I would read Commissioner Pinkert's page at JA-116 because it seems clear to me and unambiguous that he was talking about a downward pricing trend. Why should he be in subject imports, and why should he be talking about that? Well, that's what the statute requires. One of the factors for the threat analysis is that you look at the prices of subject imports entering the market at that time to see what the effect of those prices is on the domestic towers. So if he wasn't looking at the prices of subject imports at that time... Is your position that because he stated this and that the prices weren't going down overall, that therefore he's wrong, or is your position that it was impermissible for him to look at the price differentials? It's fine to look at the price differentials, but that can't be the end of the inquiry. You have to see what the prices are doing. The prices for imports, he says there's a change at the end of the period and that there's a downward pricing trend. And why would that matter? If the prices of the imports are coming down, it's putting pressure on the domestic producers' prices for selling towers. But my question is, is it sufficient if the price differential is going down? No, it's not. Because what happened, and I would refer the Court to page 28 of our opening brief, the prices in 2012 for subject import towers rose, rose substantially. The prices of the domestic producers' towers also rose substantially. Now, that isn't evidence that suggests price suppression. If you're going to draw a trend from it, it would be absurd to say that... So you're saying as a matter of law that a decrease in price differential could never satisfy a finding of price suppression. No, you have to see what the prices are doing. I believe there are cases that say you could have import prices falling and domestic tower prices rising, and that might be considered evidence of price suppression. But those are not the facts here. I think Commissioner Pinkert assumed those were the facts, but he assumed incorrectly. But when you say that you would read all 116 into the record, you'd also read his statement that although the purchasers' average additional cost for the subject imports over the cost of the domestic product was 28% for projects with installation dates between 2009 and 2011, the gap in prices shrank. The gap in prices? Yes, the gap in prices shrank. He then goes on to say... I know, but you can't leave off that part. Oh, not leaving it off at all, Your Honor. It's appropriate for him to look at the shrink in the gap, but it's not sufficient of itself. You have to look at what the prices are doing that caused that gap to shrink. Is it shrinking because import prices are coming down and domestic prices are coming down too, but the import prices are coming down faster? Or here the facts are that the import prices rose substantially and the domestic power prices rose substantially too, and that's not evident to price suppression. Your Honor, there was... And it's important too, I mean, the notion that this is just one of the things that Commissioner Pinker looked at, this is important because it goes to the causation question. Are imports... The prices of imports actually causing a threat of harm in the future? And I don't think you have causation if you can't show some sort of price effect in the future. In regard to dismissing the email as not part of the evidence, first thing I would ask is where are all of the other emails from Siemens or GE to these producers saying, hey, can you match the price of your foreign competitors? This email appeared very prominently. That's the one they seem to rely on. The other evidence they talked about, the cost of goods sold ratio to net sales, well, Commissioners Williamson and Aronoff said that those ratios were high, and that suggests that the domestic producers weren't able to raise their prices. But if you look at whether that ratio correlates to imports, you have to remember that in 2012, that's the big boom year for demand. You have all these imports coming in. And regardless of which of the two data numbers you use, you see that the cost of goods sold to net sales revenue ratio fell in 2012 when under their theory you'd expect it to go very high because you have all these imports coming in supposedly suppressing prices. There was a reference to there being lost sales, and Commissioners Williamson and Aronoff found that there were no lost sales or couldn't find evidence sufficient to support lost sales. That's JA99 footnote 190. And the final point I would make is that Commissioners Williamson and Aronoff found that Vestas at JA74 to 76, they decided that Vestas had to be included in the data that were provided. So on the one hand, they say that Vestas should be included with that data, and then they used the ratios to justify price suppression excluding that data. And that conflict is just not rational and shouldn't be sustained. Anything else for Mrs. Snarr? Anything else? Thank you. Thank you all. The case is taken under submission. That concludes the argued cases for this morning. All rise. Council Court is adjourned at 2 p.m.